UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES,

-v-

CHELSEY HARRIS a/k/a "Ms. Chinn,"

Defendant.

S2 24 Cr. 541 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Defendant Chelsey Harris, who is charged with participating in a murder-for-hire
conspiracy and other offenses, moves here to suppress two cellphones and their contents. The
cellphones were taken by New York City Police Department ("NYPD") officers in connection
with Harris's voluntary interview at a police precinct on December 27, 2023, and retained after
the interview. Harris argues that the officers, by seizing the cellphones without a warrant,
violated her Fourth Amendment rights.

For the reasons that follow, the Court denies Harris's motion.

I.    **Background**

    A.    **The Government's Factual Allegations**

        1.    **The December 2023 Shootings**

The charges in this case—brought against Harris and two co-defendants, Dajahn McBean
and Karl Smith—arise from a December 26, 2023 shooting in which one person (Clarisa Burgos)
was killed and another (Laquan Williams) was injured. The following is a summary of pertinent

events as alleged by the Government, drawn from its statements in pretrial hearings and written submissions.[1]

In December 2023, McBean and Williams were engaged in a feud over social media. At the time, McBean was in custody at the Metropolitan Detention Center ("MDC"), awaiting sentencing on a charge of assault in-aid-of racketeering, to which he had pled guilty in the Eastern District of New York on September 8, 2023. *See United States v. McBean*, No. 20 Cr. 260 (E.D.N.Y. 2020) (Dkt. 123). While at the MDC, McBean used a contraband cellphone to recruit and communicate with Harris and Smith, to arrange a plot to lure Williams to a Queens, New York nightclub, where shooters hired by or at the behest of McBean would murder Williams.

On December 24, 2023, McBean, assisted by Smith and Harris, lured Williams to Hush, a nightclub in Queens. Outside the nightclub, gunmen shot and hit Williams's vehicle multiple times, but their shots missed him.

On December 26, 2023, McBean, Smith, and Harris lured Williams to Xscape, a different Queens nightclub. Outside the nightclub, three gunmen opened fire at a car in which Williams sat in the driver's seat. The shots struck Williams numerous times and killed Burgos, who was seated in the front passenger seat.

### 2. Pertinent Investigative Steps

The ensuing investigation led the NYPD to identify Harris as a person of interest. On December 27, 2023, the NYPD received an anonymous tip indicating that a federal inmate

---

[1] The materials from which this summary is drawn include Superseding Indictment S2 24 Cr. 541, transcripts of court hearings, and the Government's submissions in connection with this suppression motion and a separate, pending motion by McBean to suppress a cellphone seized from his prison cell. Evidence adduced at the suppression hearing on Harris's motion is cited in text.

2

named Dajahn McBean had "put "a $200k hit" on Williams from prison, where "he [McBean] has a phone." Dkt. 74, Ex. 1, USAO_007466 ("Harris SW & App."), ¶ 4(g). The tip further indicated that McBean had recruited a woman, whose Instagram account was associated with Harris, to set up a meeting with Williams to effectuate the hit. *Id.* ¶¶ 4(g)–(h).

Surveillance videos of the area around Xscape accessed by NYPD captured Harris interacting with person(s) in Williams's car shortly before the shooting. *See* Dkt. 74, Ex. 6, USAO_010016 ("Harris Surveillance Video"); *see also* Harris SW & App., ¶ 4(f). The videos captured Harris walking from the car into Xscape, and then kneeling in the nightclub's vestibule, where she used her cellphone. *See* Harris Surveillance Video; Harris SW & App., ¶ 4(f). Approximately one minute later, the gunmen opened fire, killing Burgos and wounding Williams. *See* Harris SW & App. ¶¶ 4(d)–(f).

Late that evening, law enforcement officers came to Harris's home and drove her to the 107th precinct in Queens to be interviewed. The Government later determined that, while in the back of the police car on route to the precinct, Harris sent text messages to Smith and McBean, cueing them to delete communications on their cellphones and attempting to delete her own.[2] As more fully developed below, at the precinct, Harris was interviewed for approximately 45 minutes, after which NYPD officers, who had taken custody of Harris's two cellphones before the interview, retained the cellphones. As also developed below, the NYPD later obtained a court-authorized search warrant for the contents of the two cellphones.

---

[2] This conduct is a basis for Count Three, which charges the defendants with a conspiracy to destroy records, in violation of 18 U.S.C. § 371. The Court recounts this conduct solely as background. Because the NYPD did not know of Harris's deletions (and attempted deletions) until after the seizure and search of her cellphones, that conduct does not form any part of the analysis herein of her suppression motion.

On December 29, 2023, MDC staff attempted to search McBean's prison cell. However, they were temporarily blocked from entering, and upon entry, MDC officers saw McBean holding portions of a damaged contraband cellphone, with other pieces on the ground.

### B.    Procedural History

#### 1.    Harris's Arrest and Indictment

On September 16, 2024, Harris was arrested in the Southern District of Florida, based on an arrest warrant issued pursuant to an Indictment in this District. *See* Dkt. 5. She was then transported to this District. *Id.*

On October 17, 2024, a grand jury in this District returned Superseding Indictment S2 24 Cr. 541 (PAE). *See* Dkt. 32. It charged Harris, McBean, and Smith, in three counts. *Id.* Count One charged conspiracy to commit murder-for-hire resulting in personal injury and death, in violation of 18 U.S.C. § 1958; Count Two charged interstate stalking resulting in life threatening bodily injury and death, in violation of 18 U.S.C. § 2261; and Count Three charged conspiracy to destroy records, in violation of 18 U.S.C. § 371. *Id.* Trial is scheduled for July 28, 2025.

#### 2.    Harris's Suppression Motion

On February 18, 2025, Harris moved to suppress the contents of the two cellphones seized in connection with her December 27, 2023 NYPD interview.[3] Dkt. 70 ("Def. Mem."). She argues that she did not consent to the NYPD (1) taking her cellphones before the start of her interview, (2) retrieving and bringing the cellphones to the interview room mid-interview, or (3) retaining the cellphones after the interview; and these warrantless seizures violated her Fourth Amendment rights. *Id.* In support, she filed a memorandum of law, and exhibits,

---

[3] As discussed, *see supra* note 1, McBean has separately moved to suppress evidence seized from his MDC cell on December 29, 2023. *See* Dkts. 71–73. The Court will resolve that motion in a separate decision.

4

including factual affirmations of her own and by her counsel, largely attaching exhibits from discovery. *Id.* On March 4, 2025, the Government opposed the motion. Dkt. 74 ("Gov't Mem.").

On March 6, 2025, the Court issued an order directing Harris to identify material facts in dispute to justify an evidentiary hearing. Dkt. 75. On March 10, 2024, Harris submitted a letter, urging the Court to grant her motion without an evidentiary hearing. Dkt. 76 ("Def. Reply"). On March 12, 2025, the Court issued an order stating that it would hold an evidentiary hearing, focusing on "the information known to the police with respect to the cellphones at issue; Harris's statements with respect to the cellphones and their contents; and the circumstances under which the cellphones came to be stored and retrieved at the precinct." Dkt. 78.

On March 25, 2025, the Court held an evidentiary hearing. *See* Dkt. 89 ("Tr."). The Government called one witness, NYPD Detective Nicolas Perez, and presented video and documentary evidence. The defense cross-examined Perez, but did not offer live testimony.

## II.    Findings of Fact

### A.    Evidence Considered

The Court's findings of fact are based on the hearing testimony of Detective Perez, Harris's pre-hearing affidavit, Dkt. 70-3 ("Harris Aff."), and exhibits received at the hearing. These consisted of: (1) an NYPD Crimestoppers Tip from December 27, 2023, GX 3; (2) the video recording and transcript of Harris's interview with the NYPD on December 27, 2023, GX 4 (transcript), 6 (video); and (3) a chronological compilation of video footage the night of Burgos's murder on December 26, 2023, GX 5.

### B.    Facts Established

The Court finds the following facts established by a preponderance of the evidence.[4]  The bulk of these facts—particularly concerning the statements made and actions taken during Harris's video-recorded interview—are undisputed.  The Court found the testimony of the one live witness, Detective Perez, broadly credible.  In so finding, the Court evaluated Detective Perez's testimony in light of, *inter alia*, his demeanor, competence, potential bias, and the extent to which his testimony was inherently logical and consistent with physical evidence.  The Court found some but not all statements in Harris's affidavit credible.  Where statements from that affidavit are cited herein, the Court credits them, except as otherwise noted. The Court evaluated Harris's affidavit under the same standards applicable to Detective Perez's testimony, save that, because Harris did not testify, the Court was unable to evaluate her demeanor.[5]

### 1.    The Interview at the NYPD Precinct

In the late evening of December 27, 2023, NYPD officers located Harris at her parents' residence in the Bronx.  Harris Aff. ¶ 2.  The officers asked her to accompany them to a police precinct to be interviewed in connection with the homicide investigation.  Tr. at 26–29.  Harris

---

[4] On a motion to suppress, the defendant bears the burden of proving that evidence was seized unlawfully.  Where, however, as here, the defense shows that a seizure occurred without a warrant, the Government bears the burden of proving that the seizure was lawful. *See United States v. Goulbourne*, No. 23 Cr. 544, 2024 WL 4025997, at *4 (S.D.N.Y. Sept. 3, 2024); *United States v. Gonzalez*, 111 F. Supp. 3d 416, 433 (S.D.N.Y. 2015); *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).  The Government must establish the legality of such a seizure by a preponderance of the evidence. *United States v. Rivera*, 700 F. Supp. 3d 60, 67 (S.D.N.Y. 2023); *United States v. Hagood*, No. 20 Cr. 656 (PAE), 2021 WL 2982026, at *2 (S.D.N.Y. July 15, 2021), *aff'd*, 78 F.4th 570 (2d Cir. 2023).

[5] Relatedly, because Harris did not testify and her account was not subject to cross-examination, the Court affords her account less weight. *See, e.g.*, *United States v. Calix*, No. 13 Cr. 582, 2014 WL 2084098, at *1 n.1 (S.D.N.Y. May 13, 2014) (citing, *inter alia*, *United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) (summary order)); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (collecting cases).

agreed to do so voluntarily. *Id.* She was not placed under arrest or searched or coerced to do so. *Id.*[6] Detective Perez, along with at least one other officer, drove Harris to the precinct. During the drive, he observed her using her cellphone in the backseat of his car. *Id.*

Upon arrival at the 107th precinct, Harris, by her own account, was told that the interview would occur in an interrogation room, a "no phone area" where "no electronics were permitted." Harris Aff. ¶ 8. Harris also observed a sign that "stated essentially that no phones were permitted past this point." *Id.* ¶ 9. Detective Perez's testimony was in accord. He testified that, consistent with NYPD protocol, he asked Harris to surrender her two cellphones, which he secured in a precinct office. *See* Tr. at 72–77 (Perez, testifying that he told Harris that cellphones are not permitted in the interrogation room to avoid subjects recording the interview; temporarily seized Harris's cellphones, which she surrendered freely and without objection; and placed the cellphones within the 107th detective squad office).[7] Harris "understood [that her] phones were secured for safekeeping and would be returned to [her]" afterwards. Harris Aff. ¶ 11.

The interview began at approximately 12:46 a.m. on December 28, 2023. It was video- and audio-taped in full. As the recording reflects, Detective Perez began by orally reading Harris her *Miranda* rights. GX 4 at 5–6. Harris responded that she understood each right and was willing to answer questions. Tr. at 31; GX 4 at 5–6.

Relevant here, Detective Perez and Officer Marco Del Priore then asked Harris about her connection to Williams and about the shooting. Harris stated that she had met Williams during

---

[6] The Court rejects—as conclusory, untested, and uncorroborated—Harris's claim that she "felt that she had no right to decline to go with the officers." Harris Aff. ¶ 4; *see also infra* note 8.

[7] Detective Perez was not based in the 107th precinct, but he testified that, as a general practice, NYPD officers, before interviewing a witness at a precinct, remove the witness's cellphone(s) from their person and custody, to eliminate the risk of surreptitious recording of the interview. Tr. at 30–31.

summer 2023 and he messaged her afterwards, but she had not responded to his messages until late December 2023, after he "went viral on Instagram." GX 4 at 10. She stated that Williams had participated in an online feud with another person, and in doing so, had displayed large amounts of money, which garnered online attention. *Id.* at 10–11. Harris stated that, after seeing Williams's social media posts, she had messaged him and that the two arranged to go to Hush, a nightclub in Queens. *Id.*

At approximately 2 a.m. on December 25, 2023, Harris stated, Williams picked her up in his Rolls Royce and drove with her to Hush. *Id.* at 11–12. After they arrived, Williams had recognized another man, whom Williams evidently wished to avoid, and asked Harris to leave with him. *Id.* Harris stated that she had declined, opting instead to order food and drinks, and that Williams asked her to hurry so they could leave as soon as she was done eating. *Id.* at 12–13. After their meal, Harris stated, she went to the bathroom, and Williams returned to his car. *Id.* at 13–14. While she was in the bathroom, Williams called her on FaceTime, stating that gunmen had shot at him as he waited for her in his car; he asked her to leave with him immediately. *Id.* at 14. Harris stated that she had refused to join him, choosing to go home in an Uber, and Williams drove away. *Id.* Shortly afterwards, Harris stated, Williams posted a video of his car on Instagram, mocking those who had tried but failed to shoot him. *Id.* at 17. Harris stated she also saw an Instagram page called "Code 33" that tagged Williams in relation to the ongoing social media feud, which Harris understood to concern money. *See generally id.* at 17–19, 29; Tr. at 22, 35–36.

Harris stated that Williams called her on FaceTime the following morning, December 26, 2023, and asked when he could see her again. *Id.* at 18–19. Harris agreed to see him at Xscape, another nightclub in Queens, that evening. *Id.* at 19–20. Harris stated that her friend, "Pac"—

whom Detective Perez testified had been identified as co-defendant Karl Smith—drove her to

Xscape, where the two waited for Williams. *See generally* Tr. at 32–33. During this time, Harris

stated, Williams messaged her, proposing that she participate that night in a threesome sexual

encounter with him and another woman whose Instagram he messaged to Harris (and who was

later identified as Burgos), and that Harris agreed. *See generally id.*

When Williams arrived at Xscape, Harris stated, she approached Williams's car, opened

the passenger door, and saw Burgos for the first time. Tr. at 39. Harris stated that, at that

moment, she remembered that she had left her credit card inside Xscape and left to retrieve it.

*Id.* Harris stated that she called Williams on FaceTime as she left his car to explain her sudden

departure. GX 4 at 22. After retrieving her credit card, Harris stated, she returned to the

nightclub vestibule and tried to see Williams's car by looking through a window, but, on not

seeing it, she "ben[t] down . . . [to] fix [her] shoe" and re-entered the nightclub. *Id.* at 23.

Moments later, the shooting at Williams's car erupted; Harris stated that she learned of it upon

seeing the security guard "jump . . . around" inside the vestibule, and hearing women screaming.

*Id.* Harris stated that the security guard approached Harris, asking her who was in the car and

telling her that Williams "just got shot up." *Id.* at 24. About 15 minutes after the shooting,

Harris stated, she left Xscape with Pac, who drove them to his home. *Id.* at 25–26. Harris stated

that she messaged Williams later that evening.

During the interview, Harris repeatedly referred to her cellphone, indicating that it

captured her communications with Williams during the above events. Early in the interview, in

discussing how her date with Williams at Xscape was arranged, she told the interviewing

officers, "I texted him um—after all this I'll show you guys the messages." *Id.* at 7; GX 6 at

8:03–8:08. Later, in recounting the Hush shooting, she stated that Williams had called her

immediately after the gunmen had shot at his car; in response to Detective Perez's question about whether she remembered the date of these events, she told the officers: "I'd have to get my phone to show you. But it was like literally the first date him and me ever had." GX 4 at 15; GX 6 at 14:48–14:52. Still later, in recounting the Xscape shooting, in response to Detective Perez's question as to what time she had communicated with Williams in scheduling their meeting, she stated: "I gotta check my phone, that's where I made my videos. I can you tell you the time, I don't wanna lie." GX 4 at 19; GX 6 at 18:22–18:25.

About 30 minutes into the interview, and after the above exchanges, Detective Perez and Officer Del Priore left the interrogation room to retrieve a laptop on which to play a video for Harris. GX 6 at 29:31–30:53; *see* Harris Aff. ¶ 13. They returned with a laptop, a flash drive, and Harris's two cellphones. Harris Aff. ¶ 13. Officer Del Priore placed the cellphones on the interrogation room table at which Harris sat across from the officers. Harris picked up one of her cellphones to check if her mother had called. GX 6 at 30:53–30:59. She left the cellphones on the table while the questioning continued. *Id.*

Detective Perez then showed Harris video footage of the Xscape vestibule shortly before the December 26, 2023 shooting. Harris identified herself as the woman shown there wearing a white jacket, jeans, and sneakers. GX 4 at 35. She acknowledged that the video showed her on her cellphone with Williams. *Id.* at 38–39. Detective Perez then showed Harris a video clip of her in the vestibule about a minute before the shooting. He pointed out to Harris that, contrary to what she had told the officers, the footage did not show her touching her shoes, but rather using a cellphone while kneeling. GX 6 at 35:38–37:41.

At this point, the tone of the interview shifted, with Detective Perez voicing skepticism of aspects of Harris's account and Harris becoming defensive and agitated. Detective Perez stated

that he had reviewed video footage that showed that, by the time Harris left Xscape to speak with the occupants of Williams's car, she had already paid. GX 4 at 39. The implication of this statement was that Harris's claim to have left the car and returned to Xscape shortly before the shooting to retrieve her credit card was false. Detective Perez also asked Harris who set up the hit on Williams. *Id.* Harris denied involvement in the shooting. In support, she pointed to her cellphones on the table, stating, "the messages [with Williams] is there." GX 4 at 43; GX 6 at 43:44–43:46.

As the video reflects, Harris by this time was irritated, raising her voice, and interrupting and talking over Detective Perez's questions. *See* GX 4 at 48 ("I'm arguing with [Detective Perez]."). She accused Detective Perez and Officer Del Priore of falsely accusing her of participating in Burgos's murder. *Id.* at 44. They—primarily Detective Perez—responded by stating that they had received a tip and social media postings linking Harris to a scheme to kill Williams. *Id.* at 45. Harris denied that allegation. GX 6 at 43:46–52:00. The officers told Harris that their theory was that, upon seeing Burgos in Williams's car, Harris had panicked, because Burgos was not an intended victim of the imminent shooting. GX 4 at 46–47. Harris denied those allegations. *Id.* at 47–48. The interview remained heated, with Harris and the officers raising their voices and cursing at each other. GX 4 at 46–47, 49–50; GX 6 at 46:51–47:06, 49:45–50:22.

At approximately 52 minutes into the interview, Harris requested an attorney and stated that she wanted to go home. GX 6 at 52:00–52:11 ("I want a lawyer, or whatever the fuck."). The officers immediately stopped questioning Harris, with Detective Perez stating, "That's fine." *Id.* Harris then picked up her cellphones and put them down on the table. *Id.* at 52:11–52:14.

When the interview concluded at approximately 1:40 a.m., Detective Perez seized the cellphones that Harris had left on the table and handed them to Officer Del Priore. *Id.* at 52:20–52:25.

Later, outside the interview room, Detective Perez asked Harris how she planned to return to her parents' home. She replied that she would "call [her] parents or an uber from [her] phone." Harris Aff. ¶ 20. Detective Perez told Harris he would not be returning her cellphones. She "threw a tantrum" and "demanded [her] phones." *Id.* ¶ 21. He gave her a voucher for her cellphones, and called Harris a car service to return her to her parents' home. *Id.* ¶¶ 23, 25.

## 2.    The Search Warrant

Less than 18 hours later, at 5:56 p.m. on December 28, 2023, NYPD Detective Philip Degorter obtained a warrant from a state-court judge authorizing a search of the two cellphones. *See* Harris SW & App. at USAO_007467. The supporting affidavit to which Detective Degorter swore described evidence that had led the officers to identify Harris as an investigative subject before her interview at the 107th precinct, including the video surveillance of Harris at Xscape on December 26, 2023, and the Crimestoppers tip tying Harris to the shooting. *Id.* ¶¶ 4(f)–(h). It also reported Harris's statements during the interview about her electronic communications with Williams surrounding the shootings, *id.* ¶ 4(j), and stated that the two cellphones "in her possession . . . were recovered by members of the [NYPD]," *id.* ¶ 4(k). It also asked that the warrant application be sealed on the ground that "dissemination of information contained within this application could seriously jeopardize this ongoing criminal investigation," and that "if potentially unidentified perpetrators and or accomplices were made aware of the contents of this application, they could destroy evidence, including information saved to . . . mobile devices, and cloud storage." *Id.* ¶ 6. The state-court judge authorized the sealing of the application. *Id.* at USAO_007473.

## III.    Discussion

Harris's suppression motion challenges the seizure of her cellphones at the 107th precinct. She does not challenge the admissibility of her statements during the interview, which followed a *Miranda* warning and were undisputedly voluntary. In her written motion, Harris argues that the NYPD officers illegally seized her cellphones at two points—mid-interview, when the officers moved the cellphones into the interview room, and at the interview's end, when the officers retained and refused to return the cellphones. Def. Mem. at 4. At argument after the suppression hearing, Harris also challenged the officers' earlier action in causing Harris to surrender the cellphones for safekeeping, before the interview. Tr. at 109–11. Harris separately challenges the warrant to search the cellphones' contents, on the grounds that Detective Degorter's affidavit in support did not set out probable cause or the basis on which the officers had seized the cellphones without a warrant. Def. Reply at 1–2.

The Government defends each action that Harris terms an unlawful seizure. It argues that the first two (taking the cellphones for safekeeping and moving them to the interview room) were consensual and that the third (retention of the cellphones after the interview) was justified under the plain view and exigent circumstances doctrines. Gov't Mem. at 9–13. The Government also defends the search warrant as proper. *Id.* It alternatively argues, that, even if the warrant affidavit were deficient, the search pursuant to the warrant was undertaken in good faith reliance on a court-authorized warrant, making suppression of fruits of the search improper. *Id.* at 18–21.

For the reasons that follow, the Court finds lawful each alleged action with respect to the seizure and movement of cellphones that Harris challenges. The Court also upholds the search of the cellphones pursuant to the state-court warrant. The Court therefore denies Harris's motion to suppress the contents of the cellphones.

13

### A.    The Seizures of the Cellphones

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its central requirement is reasonableness. *See Texas v. Brown*, 460 U.S. 730, 739 (1983). Warrantless searches are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions," including, relevant here, consent and exigent circumstances. *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

It is undisputed that, at each relevant point, the NYPD seized Harris's cellphones within the meaning of the Fourth Amendment. The Court analyzes in turn the legality of each seizure.

### 1.    Harris's Relinquishment of Her Cellphones

Harris first challenges her relinquishment of her cellphones to NYPD personnel before she entered the interrogation room. That warrantless seizure, however, was lawful, because Harris consented to it.

An officer may seize private property "without violating the Fourth Amendment if the owner . . . voluntarily gives consent." *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996). "Whether an individual has given consent is essentially a fact-based inquiry that must be determined by the 'totality of all the circumstances.'" *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). Consent may be granted either explicitly or implicitly, and may be inferred from an

14

individual's words, gestures, or conduct. *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir. 1981); *see also United States v. Grant*, 375 F. App'x 79, 80–81 (2d Cir. 2010) (verbal consent effective despite disputed validity of defendant's written consent). To be valid, consent must be given freely and voluntarily. *Schneckloth*, 412 U.S. at 222.

The assembled evidence here firmly establishes that Harris voluntarily surrendered her devices to the NYPD at the 107th precinct before entering the interrogation room to sit for an interview in which she freely participated. Detective Perez's testimony was emphatic and convincing that Harris voluntarily accompanied the officers to the precinct for the interview. She was not coerced or compelled to join them. No evidence would support the contrary conclusion.[8] On the contrary, Harris's voluble and glib comportment during the first 30 minutes of the videotaped interview is consistent with a person hungry—if not eager—to talk and share an account of her purported innocence.

As to her relinquishment of her cellphones, on arrival at the precinct, by Harris's own account, Detective Perez told her that, per protocol, electronic devices were not permitted in the interrogation room. Harris admits that she was "shown a sign" that stated, "no phones were permitted past this point." Harris Aff. ¶ 9. She further admits that, before entering the interrogation room, she gave her cellphones to Detective Perez, understanding that her cellphones would be retained and "secured for safekeeping and would be returned to [her]" after

---

[8] The Court has rejected as conclusory Harris's statement that, because the officers asked her to come to the precinct to speak with them, she "felt that [she] had no right to decline to go with the officers." Harris Aff. ¶ 4. Harris does not identify any coercive conduct by the officers. She notes only their having come to her parents' home and requested that she accompany them for an interview at the precinct. She does not claim that the officers used or displayed handcuffs or firearms, made threats, or used any words indicative of coercion. And she does not claim to have done or said anything to resist coming to the interview. *See United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (citing *Schneckloth*, 412 U.S. at 228).

the interview. *Id.* ¶ 11; *see* Def. Mem. at 3 ("Harris believed her phones would be temporarily stored for safekeeping and returned to her."). These facts establish Harris's consent to the temporary warrantless seizure by law enforcement lasting through her interview, much as the case law upholds as voluntary the temporary relinquishment of cellphones and other personalty in other contexts. *See, e.g., United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 81 (2d Cir. 2002) ("[A]irline passengers know that they must subject their personal effects to reasonable security searches."); *Bensam v. Bharara*, No. 12 Civ. 5409, 2014 WL 1243790, at *3 (S.D.N.Y. Mar. 25, 2014) ("[T]here is no question the initial seizure of the phone was reasonable, as Plaintiff acknowledges she voluntarily deposited it with the [court security officers] upon entering the courthouse pursuant to the Court's security procedures.") (collecting cases); *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 396 (S.D.N.Y. 2007) (upholding seizure of blood because driver "consented to the blood test simply by operating a motor vehicle within the state of New York").

Nor is there a claim that the officers exceeded the temporal scope of Harris's consent to the sequestration of her cellphones during the interview. On the contrary, as noted, Detective Perez and Officer Del Priore reunited Harris with her cellphones mid-interview, prompted by her having told the officers that the cellphones held evidence of her communications with Williams and by her offer to show these to the officers.

Because Harris consented to the relinquishment of her cellphones, the officers were not required to obtain a warrant to take the cellphones from her prior to the start of the interview. *See, e.g., United States v. Simmons*, 543 F. App'x 101 (2d Cir. 2013) (upholding warrantless seizure of firearm based on defendant's implied consent); *United States v. O'Brien*, 498 F. Supp. 2d 520, 543 (N.D.N.Y. 2007), *aff'd*, 303 F. App'x 948 (2d Cir. 2008) (upholding warrantless

16

seizure of electronic devices based on defendant's consent); *United States v. Cabrera*, No. 23 Cr. 209, 2023 WL 8812532, at *7 (S.D.N.Y. Dec. 20, 2023) (denying motion to suppress evidence seized after defendant consented to search).

### 2.    The Officers' Move of the Cellphones to the Interrogation Room

Harris next challenges the officers' actions—about halfway through the interview—in retrieving Harris's cellphones and bringing them, plus a laptop and a flash drive, to the interrogation room for use during the balance of the interview. Upon returning to that room, Officer Del Priore placed Harris's cellphones on the interrogation table in front of her. Harris briefly picked up one cellphone to check if her mother had called. Afterwards, she left the cellphones on the table, where they sat, untouched, for the remainder of the interview.

The officers' move of the cellphones from safekeeping to the interview room did not offend the Fourth Amendment. It was, in two independent respects, within the scope of Harris's consent. First, Harris had consented to being separated from her cellphones during her interview. In bringing the cellphones to her mid-interview, the officer merely expedited their return. Second, as Detective Perez testified, the officers brought the cellphones to Harris because, during the interview, she had repeatedly stated that the cellphones captured her communications with Williams surrounding their meetings at Hush and Xscape, and had offered to show these to the officers. Tr. at 78–79. Harris's statements, fairly understood, conveyed consent to having the officers bring the cellphones to her. *See, e.g., United States v. Iverson*, 897 F.3d 450, 461 (2d Cir. 2018) (defendant's statements permitting officers to enter his apartment amounted to express consent, and that such "implicitly extended to [K-9]"); *Grant*, 375 F. App'x at 80 (defendant's "conduct during this [police] interaction, coupled with the undisputed absence of force, confirms the district court's conclusion of implied consent"); *Seifert v. Rivera*, 933 F.

17

Supp. 2d 307, 316 (D. Conn. 2013) ("[I]t was objectively reasonable for the [d]etectives to believe that [the suspect's daughter] had consented to their entry when she stepped backwards from the open door."). And Harris's response upon arrival of the cellphones confirms that consent. She did not say or do anything to object to the cellphones' return.

It is no answer to note that the officers ultimately did not review the cellphones' contents with Harris. The officers demonstrably intended to do so, but Harris terminated the interview midstream. Tr. at 78–79. She did so after Detective Perez, using the laptop he had brought into the room with Harris's cellphones, showed Harris video footage capturing her actions immediately before Burgos's murder and inquired about these actions. When the officers voiced skepticism about her account, the interview grew heated, leading Harris to demand a lawyer, and the officers to terminate their questioning. GX 4 at 52. Had the interview continued, the Court finds, the officers would eventually have asked to review the cellphones' contents with Harris, because, on Harris's account, they likely contained probative evidence, including of Harris's communications with Williams on the nights at which he had been shot at (and shot).

### 3.    The Officers' Retention of the Cellphones After the Interview

In her most substantial challenge, Harris argues that the officers' warrantless retention of the cellphones after Harris ended the interview infringed her Fourth Amendment rights. Unlike the officers' earlier conduct with respect to the cellphones, that seizure cannot be justified on the ground of consent, as Harris's consent to relinquishing the cellphones lasted only through the interview, after which Harris demanded the cellphones' return. The Government invokes two exceptions to the warrant requirement: for exigent circumstances and items in plain view. Under the facts here, the Court holds, the exigent circumstances doctrine authorized the officers to

temporarily retain the cellphones while diligently obtaining a warrant to search their contents. The Court thus denies the motion to suppress.

In determining whether exigent circumstances justify a warrantless seizure, "[t]he core question is whether the facts . . . would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action," including action "to prevent the imminent destruction of evidence." *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (citation omitted). The test "is an objective one that turns on the . . . totality of circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990), *cert. denied*, 498 U.S. 1119 (1991) (citation omitted). The Supreme Court "has upheld temporary restraints where needed to preserve evidence until police could obtain a warrant," and has never "held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." *Illinois v. McArthur*, 531 U.S. 326, 334 (2001).

Measured against that familiar test, the circumstances here clearly permitted the NYPD to hold Harris's cellphones while expeditiously (within 18 hours) pursuing a search warrant. To begin, by the end of the interview, there was clear probable cause to believe that the cellphones held evidence relevant to the attempt to shoot Williams outside Hush on December 24 and to the shootings of Williams and Burgos outside Xscape on December 26. Before the interview, the officers had viewed surveillance footage showing Harris on a phone call with Williams before and after Harris left Xscape to engage with Williams's car outside Xscape nightclub. Tr. at 14–15. The footage also showed Harris using her cellphone to speak to an as-yet unidentified person while kneeling surreptitiously in the nightclub's vestibule approximately a minute before the shooting. *Id.* This footage, by placing Harris on the scene of the second shooting and in

active contact with target Williams, corroborated in part the Crimestoppers tip to the NYPD that had identified MDC inmate McBean as instigator of the shooting and Harris as a facilitator of it. *Id.* at 21–22.

Harris's statements during her interview fortified that the cellphones contained evidence of real-time communications bearing on the shootings. Harris admitted communicating by phone with Williams in connection with both incidents. She told the officers that she and Williams had arranged their gathering at Hush by cellphone; that Williams had communicated with her by phone immediately after the failed attack on him; and that the two had done so again afterwards, including to arrange their next outing, at Xscape. *See* GX 4 at 11, 14, 16, 18–22. During the interview, she admitted using a cellphone to communicate with Williams by text message, FaceTime, and over social media. *See id.* at 7, 11, 17–19, 21, 24, 32, 35; Harris SW & App. ¶ 4(f). And, when later confronted in the interview with surveillance footage depicting her kneeling and using her cellphone moments before the Xscape shooting, Harris, implying that this use of her cellphone did not bespeak her complicity in the plot to shoot Williams, gestured to her cellphones and stated, opaquely, "the messages with [Williams] is there." GX 4 at 43; GX 6 at 43:44–43:46. Indeed, Harris herself underscored the cellphones' relevance to the investigation when she invited the officers, multiple times during the interview, to review the cellphones' contents with her. *See* GX 4 at 7, 15, 19; GX 6 at 8:03–8:08; 14:48–14:52; 18:22–18:25.

And removing the cellphones from Harris's custody and control was clearly "necessary . . . to prevent [the] destruction or disappearance" of investigative evidence. *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). After the officers showed Harris the surveillance footage, and questioned her account with evident skepticism, it was unavoidably obvious to her that they suspected her of complicity in the conspiracy to shoot Williams that caused Burgos's

death. The officers' appreciation that the cellphones likely contained important evidence bearing on the shootings would also have been apparent to Harris. Detective Perez had also seen Harris using her cellphone in the back of his police car on route to the precinct, although he was as yet unaware that she was deleting evidence on it. Tr. at 71. In these circumstances, ceding custody of the cellphones to Harris while the agents sought a warrant to search them would have invited Harris to delete evidence on them or destroy the cellphones themselves. Harris's incentive and ready ability to delete digital evidence on the cellphones—or to dispose of them altogether— justified the temporary seizure of the cellphones while the officers pursued a warrant to search them. *See United States v. Walters*, 678 F. App'x 44, 47 (2d Cir. 2017) (upholding warrantless seizure where suspect's continued access to electronic device "raised safety concerns, and because [defendant] could have been in the process of destroying evidence"); *United States v. Martinez*, No. 20 Cr. 98, 2021 WL 7159898, at *4 (E.D.N.Y. Nov. 17, 2021), *R&R adopted*, 2022 WL 214608 (E.D.N.Y. Jan. 25, 2022) (similar).

That Harris might destroy relevant evidence was reinforced by the officers' reasonable perception that she had lied to them during the interview about why she had knelt in the Xscape vestibule before the shooting. Denying that that she had been using her cellphone, Harris stated that she had knelt to "fix [her] shoe," GX 4 at 23; confronted with the surveillance footage contradicting that story, she grew hostile and evasive, Tr. at 37–38. The officers also reasonably viewed Harris as having lied when she told them she had returned to the nightclub to get her credit card after visiting Williams in his car. Tr. at 39. Contradicting that story, the Xscape receipts and video footage showed that Harris had paid for her purchases some 10 minutes earlier, before Williams arrived at Xscape. GX 5.

"It is common [and permissible] for the police to temporarily seize a suspect's personal property if they have probable cause and intend to apply for a warrant to search the property for evidence of a crime." *Smith*, 967 F.3d at 202. Such was so here. There was probable cause that Harris's cellphones held incriminating evidence, and good reason to fear the destruction of such evidence had the cellphones been left with Harris. *See McArthur*, 531 U.S. at 331; *Simmons*, 661 F.3d at 157.

This case is on all fours with numerous cases involving temporary seizures of cellphones in similar circumstances. Particularly apposite is *United States v. Burton*, 756 F. App'x 295 (4th Cir. 2018), *cert denied*, 139 S. Ct. 1636 (2019). There, detectives investigating a victim's report that a man had attempted to take a salacious photograph of her, conducted a voluntary interview of a defendant at a police station. *Id.* at 297. During the interview—to which the defendant brought his personal and employer-issued cellphones—the defendant acknowledged crouching behind the victim with a cellphone in his hand, but denied taking photographs. *Id.* The detective expressed his skepticism of that story and, at the interview's end, seized both cellphones, on the ground that there was probable cause to believe they held relevant evidence and reason to believe that the defendant would delete digital evidence or dispose of the cellphones. *Id.* Two days later, the detective obtained a search warrant for the cellphones. *Id.*

The Fourth Circuit, upholding denial of a suppression motion, sustained the warrantless seizure, finding probable cause and that the seizure of the cellphones following the interview "was justified under the exigent circumstances exception to the warrant requirement." *Id.* at 299. It noted that the defendant knew he was being investigated; he could have easily "deleted, transferred, or otherwise removed the digital photos from the phones"; the detective had doubted the defendant's account; and the detective reasonably believed the defendant might destroy

22

photos on the cellphones or the cellphones themselves. *Id.* It found that the detective had "made sufficiently 'reasonable efforts' to balance law-enforcement needs with [the defendant's] Fourth Amendment rights," by "conduct[ing] a voluntary interview," "not immediately plac[ing] [the defendant] under arrest, and wait[ing] to seize the phones until after investigating the victim's allegations and providing [the defendant] with an opportunity to give his version of events." *Id.* (citing *McArthur*, 531 U.S. at 332). And the two-day delay between the warrantless seizure and the issuance of the warrant, the Fourth Circuit held, had been reasonable. *Id.* at 300.

Other cases are in accord. *See, e.g., United States v. Mason*, 21-5384-CV, 2021 WL 5647774 (6th Cir. 2021) (upholding warrantless seizure of cellphone after voluntary interview at suspect's home, based on exigent circumstances doctrine); *United States v. Babcock*, 924 F.3d 1180 (11th Cir. 2019) (similar); *United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017) (collecting cases); *see also State v. Correa*, No. KNL-CR-180135304-T, 2022 WL 489718, at *6–8 (Conn. Super. Ct. Jan. 18, 2022) (upholding warrantless seizure of cellphone based on exigent circumstances doctrine after voluntary interview at police station, in part because, during the interview, "the [suspect] became highly defensive"); *State v. Deen*, 965 N.W.2d 181 (Wis. Ct. App. 2021) (similar); *State v. Deem*, 243 W. Va. 671 (Sup. Ct. App. 2021) (similar); *Martinez*, 2021 WL 7159898, at *3–4 (upholding warrantless seizure under exigent circumstances doctrines where "[t]here was probable cause to believe that the HP Laptop may contain evidence of . . . offenses and such evidence could easily have been destroyed were the Laptop not seized").

The Court accordingly finds the exigent circumstances doctrine applicable here, and denies the motion to suppress based on the warrantless seizure of Harris's cellphones.[9]

**B.    The Search Warrant for the Phones**

Harris separately challenges, on two grounds, the warrant issued by a state judge authorizing a search of the cellphones. She argues that the affidavit submitted by Detective Degorter in support of the warrant (1) did not recite facts supporting probable cause and (2) did not specify the means by which the officers had recovered the phones and thus did not allege facts supporting exigency. Def. Reply at 5–6. Neither argument justifies suppression.

First, the search of the cellphones was amply supported by probable cause, for the reasons set out above. And Detective Degorter's affidavit in support of the warrant adequately recited facts supporting probable cause. It noted that (1) Harris's cellphone contained evidence of real-time communications—by text message, FaceTime, and over social media—with

---

[9] In light of this ruling, the Court does not have occasion to resolve whether the warrantless seizure would alternatively be justified based on the plain view exception. The Government invokes that doctrine based on the fact that, at the time the officers took the cellphones at the end of the interview, they were in plain view on the interrogation room table. Harris counters that the cellphones were there only because the officers had moved them into the interrogation room mid-interview. *See Kentucky v. King*, 563 U.S. 452, 463–64 (2011) (collecting cases); *United States v. Johnson*, 12 F.3d 760, 764 (8th Cir. 1993), *cert. denied*, 512 U.S. 1211 (1994) ("The police themselves, however, cannot create the exigency."); *MacDonald*, 916 F.2d at 772 ("'[L]aw enforcement agents may not create their own exigencies 'through illegal conduct.'" (quoting *United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir. 1980)); *State v. Robinson*, 2010 WI 80, ¶ 32, 327 Wis. 2d 302, 326 (2010) ("This court has recognized that police officers may not benefit from exigent circumstances that they themselves create."). The Government counters that the officers had a valid reason to move the cellphones there, based on Harris's invitation to them to review the communications on the cellphone with her, and that in any event, the cellphones would have come into the officers' view (and hands) regardless over the course of returning them post-interview to Harris. *See, e.g., United States v. Kurland*, No. 23-6755-CR, 2024 WL 5165547, at *2 (2d Cir. Dec. 19, 2024) (warrantless seizure lawful under plain view exception where agent instructed suspect to bring device to FBI field office and prior to arrest); *United States v. Chierchio*, No. 20 Cr. 306, 2022 WL 523603, at *11 (E.D.N.Y. Feb. 22, 2022) (similar).

Williams in connection with both shootings; (2) Harris told Detective Perez that she and Williams had arranged their meetings at Hush and Xscape by cellphone; (3) surveillance footage depicted Harris kneeling and using her cellphone moments before the Xscape shooting; (4) Harris's Instagram account was linked, via a Crimestoppers tip, to the Burgos murder; and (5) Harris invited Detective Perez, multiple times during the interview, to review the cellphones' contents with her.  Harris SW & App. ¶¶ 4(f)–(j).  No more was needed.  It was manifestly proper for the state-court judge to issue the warrant.

Second, Detective Degorter's affidavit reported, accurately, that the officers had recovered Harris's cellphones.  Detective Degorter was not under any obligation there to set out the facts underlying the recovery and why these satisfied the exigent circumstances exception. Harris's contrary argument conflates two distinct Fourth Amendment events: the officers' seizure of the phones, which was complete as of Detective Degorter's affidavit, and the search of the phones' contents, which had not yet commenced and for which a search warrant based on a showing of probable cause was needed and being sought under *Riley v. California*, 573 U.S. 373 (2014), which underscored that a seizure of a phone and a search of its contents are distinct Fourth Amendment events.  Harris does not cite authority that a warrant seeking authority to search a phone validly seized pursuant to a warrant exception is required to set out the facts supporting that exception.

Finally, even if the state-court judge had erred in finding probable cause, the executing officers acted in good-faith reliance on the issuance of that warrant.  A finding by a neutral judge or magistrate of probable cause is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant."  *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (citation omitted).  The duty of a reviewing court such as this "is simply to ensure that the

magistrate had a 'substantial basis for . . . concluding' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)) (citation omitted).  When officers act in reasonable reliance on a court-authorized warrant, the exclusionary rule does not apply, even if in hindsight the magistrate erred in finding probable cause. *See United States v. Leon*, 468 U.S. 897, 922 (1984); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).  That presumption is overcome only where (1) the magistrate was misled by knowingly or recklessly false information in the affidavit; (2) the magistrate "wholly abandoned his judicial role"; (3) an affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citation omitted).  None of these elements are present, or even alleged, here.  Thus, even had there been a deficiency in the warrant application, the good cause exception to the exclusionary rule would apply, and defeat Harris's bid for exclusion of the fruits of the search of her phones. *See, e.g.*, *United States v. Falso*, 544 F.3d 110, 129 (2d Cir. 2008) (upholding application of good-faith exception in denying defendant's suppression motion); *United States v. Teman*, No. 19 Cr. 696 (PAE), 2019 WL 6998634, at *2 (S.D.N.Y. Dec. 20, 2019) (finding good-faith exception to apply); *United States v. Guillen*, No. 17 Cr. 512, 2018 WL 5831318, at *14 (S.D.N.Y. Nov. 7, 2018) (same); *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *9 (S.D.N.Y. Jan. 21, 2016) (same).

## CONCLUSION

For the reasons above, the Court denies Harris's motion to suppress. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 70.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 10, 2025
New York, New York

27